RONALD S. NASH AND LINDA B. NASH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nash v. Commissioner
Docket No. 49000-86
United States Tax Court
T.C. Memo 1993-327; 1993 Tax Ct. Memo LEXIS 333; 66 T.C.M. (CCH) 195; July 26, 1993, Filed *333 Decision will be entered under Rule 155. For petitioners: Daniel H. Kornblatt and Martin A. Stoll. For respondent: Susan T. Becker and Susan G. Lewis. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION *334 WHALEN, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Additions to Tax and Additional Interest Year
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2)
Sec. 6621(c)
50% of interest on:
Applies to: 1981
$ 262,811
$ 13,141
$ 172,460
$ 196,716
1982
30,530
-- --
23,123
1983
481,573
24,079
229,659
481,573
All section references are to the Internal Revenue Code, as amended. The issues for decision are: (1) Whether petitioners are entitled to the tax benefits, including depreciation deductions *335 and investment credits, claimed in connection with three automobile sale-leaseback transactions; (2) whether petitioners failed to report interest income in the amount of $ 8,271; (3) whether petitioners are liable for the increased rate of interest under section 6621(c); and, (4) whether petitioners are liable for the addition to tax for negligence under section 6653(a)(1) and (2). FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the subject petition was filed, petitioners resided in Tenafly, New Jersey. In this opinion, we use terms such as "agreement", "purchase", and "lease" for convenience only and not to denote findings regarding legal relationships. References to petitioner are to Mr. Ronald S. Nash. Petitioner is an experienced and knowledgeable investor. He holds a degree in finance from Pace College, where he majored in accounting and economics. During the years in issue, petitioner's principal business activity was stock trading. Petitioners reported income from that activity of $ 529,746 in 1981, zero in 1982, and $ 914,500 in 1983. They *336 also reported net capital gains from Mr. Nash's investment activities of $ 99,407 in 1981, $ 181,414 in 1982, and $ 64,669 in 1983. Petitioners report income and expenses for Federal income tax purposes using the cash receipts and disbursements method of accounting. Petitioners retained a tax attorney, Mr. Sanford Amdur, to prepare their joint Federal income tax returns for the years at issue. In 1981, Mr. Amdur also advised petitioner about impending changes in the tax laws, such as accelerated depreciation and tax credits for investment in depreciable property. Mr. Amdur discussed with petitioner the impact of those changes on businesses engaged in equipment leasing. Petitioner decided to begin leasing automobiles under the name Nash Leasing, a sole proprietorship. The business address of Nash Leasing was that of Mr. Amdur's law firm. Leasing Unlimited Corp. -- 1981 Agreement
In May or June of 1981, Mr. Amdur introduced petitioner to Mr. Robert Inselberg, president of Leasing Unlimited Corp. (hereinafter LUC). At that time, LUC faced a cash shortage and needed additional capital. On December 30, 1981, petitioner, acting as sole proprietor of Nash Leasing, executed *337 a series of documents on the basis of which he claims to have purchased 49 automobiles from LUC, and to have leased the automobiles back to LUC for a term of 17 months. Petitioner and Mr. Inselberg signed a "Purchase Agreement", dated December 30, 1981, under which petitioner purportedly purchased property described therein as "certain leasable property (the 'Property') more particularly described in Exhibit 'A' annexed hereto and incorporated herein". Attached to the Purchase Agreement is a document entitled "Nash Leasing Schedule of Assets" which lists 49 automobiles by "Lease #". No Exhibit "A" is annexed to the Purchase Agreement. The Purchase Agreement sets forth the purchase price of the "Property" and the method of payment as follows: The purchase price for the Property to be paid by the Purchaser to the Seller shall be the sum of $ 797,184.15 plus any applicable State or local sales and/or excise tax. The sum of $ 797,184.15 shall be paid in the following manner: (a) Upon execution of this Agreement the assumption of outstanding indebtedness in the amount of $ 716,299.08. (b) The sum of $ 80,885.07 to be evidenced by Purchaser's Promissory *338 Note (the "Note") to be paid over the period of seventeen (17) months in equal monthly installments of $ 4,757.95 per month, with interest as set forth on the underlying financing obligations incorporated herein and a Security Agreement securing the aforesaid Note and equipment. The Note and the Security Agreement shall be in the forms annexed hereto as Exhibits "B" and "C", respectively . . . $ 80,885.07 Total Purchase Price . . . $ 797,184.15
The exhibits referred to above as "Exhibits 'B' and 'C'" are not attached to the version of the Purchase Agreement contained in the record of this case. The Purchase Agreement requires Nash Leasing, the buyer, to deliver the following documents, among others, to LUC at closing: (1) An Assumption Agreement in the Amount of $ 716,299.08 and a Promissory Note in the amount of $ 80,885.07 due and payable to Seller * * *.
The record contains an "Assumption Agreement" dated December 30, 1981, under which petitioner purportedly assumed personal liability for unpaid indebtedness of Nash Leasing to third parties to the extent of a maximum liability of $ 800,000. The Assumption Agreement states as *339 follows: The undersigned is the owner of NASH LEASING, an unincorporated business, (the "Proprietorship") The [sic] undersigned understands and acknowledges that the Proprietorship will undertake to purchase and thereafter lease certain personal property. In connection with the acquisition, leasing, operation, and disposition thereof, the Proprietorship anticipates incurring certain liabilities to third parties. To the extent, if any, that an unpaid balance remains outstanding on such indebtedness (the "Indebtedness"), and the amount of the Indebtedness shall not be paid by the Proprietorship when due, the parties to which the Proprietorship is indebted, shall have recourse to the undersigned personally to require his payment of such amount, not to exceed a total liability of Eight Hundred Thousand ($ 800,000.00) Dollars.
Attached to the Assumption Agreement is a document entitled, "Assumption of Liability Nash Leasing Schedule of Assets" which lists the same 49 automobiles by "Lease #" as set forth on the Schedule of Assets attached to the Purchase Agreement. There is also a column of amounts labeled "BALANCE DUE". The Assumption Agreement makes no reference to this *340 document and its purpose is not evident from the record of this case. The record also contains a "Negotiable Promissory Note" in the principal sum of $ 80,885.07. This note states that it is payable as follows: In monthly installments as per the attached outstanding loans, for the term of seventeen (17) months, with the entire remaining unpaid principal balance due therein as a balloon payment.
There is attached to the promissory note a document entitled "Nash Leasing Schedule of Assets" which lists the same 49 automobiles by "Lease #" as set forth on the Schedule of Assets attached to the Purchase Agreement. The document attached to the promissory note also lists a "Loan" amount for each of the automobiles. We find nothing attached to the note that specifies the monthly installments required under the note or the interest rate. The Purchase Agreement requires LUC, the seller, to deliver the following documents to Nash Leasing at the closing: (1) A properly executed Bill of Sale (the "Bill of Sale") for the aforesaid Property, in the form annexed hereto as Exhibit "D"; (2) Lease Agreements attached hereto as Exhibit "C" and incorporated herein *341 to this purchase; (3) Any other documents or instruments reasonably requested by Purchaser to effectuate the transaction contemplated by this Agreement.
The exhibits referred to above as Exhibits "D" and "C", described as the Bill of Sale and Lease Agreements, are not attached to the version of the Purchase Agreement contained in the record of this case. The record contains a Bill of Sale dated December 30, 1981, under which LUC sold "the equipment described in the Purchase Agreement annexed hereto." A purchase agreement is not annexed to the Bill of Sale but there is annexed thereto a document entitled "Schedule 'A' Nash Leasing Schedule of Motor Vehicles", which sets forth a list of 49 lease numbers and motor vehicles. This is the same list of 49 automobiles which is set forth in the Schedule of Assets attached to the Purchase Agreement. Schedule "A" of the Bill of Sale also sets forth the "Cost" of each of the 49 automobiles. Set out below is the lease number and automobile description of the 49 automobiles listed on the schedules attached to the Purchase Agreement, Bill of Sale, Negotiable Promissory Note, and Assumption Agreement, together with the "Cost" *342 taken from the Bill of Sale, the "Loan" taken from the Negotiable Promissory Note, and the "Balance Due" taken from the Assumption Agreement: Lease #
Automobile Description "Cost" "Loan"
1400 81 Chev Camaro Z28 123848
$ 8,884.37  $ 1,864.37  1401 65 Chev Corv. 120447
4,530.98
4,530.98 1404 81 Olds CSB 455310
10,233.79
1,177.76 1407 81 Cad. Sev. 700571
23,539.54
5,443.54 1409 81 Buick Century Ltd 141352
9,900.00
2,940.00 1410 81 Olds CSB 433850
9,309.54
1,915.05 1414 81 Olds Delta 88B-225994
9,215.59
1,207.76 1415 81 Datsun Maxima 007784
11,000.00
1,362.02 1416 81 Chev Imp Wgn 217178
9,667.51
1,133.96 1417 81 Olds S Wgn CC 476163
8,336.84
625.12 1419 81 MB 000812
28,375.00
9,221.32 1420 81 Cad Eldo 615433
16,550.00
1,548.19 1423 81 Renault Le Car 025290
6,548.30
1,218.30 1426 80 Volvo GIEA 018242
12,763.00
(1,054.03)
1431 81 MB 240D 248709
18,480.00
4,294.00 1434 81 Chev Malibu 431188
7,585.19
856.56 1435 81 Buick Elec Ltd 478840
11,500.31
862.82 1436 81 Chev Trk 4127478
11,487.87
1,655.01 1451 81 Olds CSB 488839
8,912.19
438.19 1452 81 Olds CSB 490187
9,247.59
443.59 1456 81 Pontiac HB T1000
5,983.00
5,983.00 1462 80 Cadillac Sev 694275
11,306.88
697.88 1464 81 Buick Reg. 181563
8,944.00
1,112.00 1468 81 Jaguar 329036
26,765.00
11,539.78 1473 81 VW Jetta 353656
9,050.00
549.00 1477 81 Chev C20 van
8,199.00
1,350.24 1479 81 BMW 064317
16,000.00
560.00 1480 81 Pontiac TA
10,093.49
939.49
1481 81 Caddy Eldorado 648348
17,407.16
798.16 1484 81 VW Dasher Wgn 906272
9,576.00
330.00 1487 81 Audi 5000
15,090.00
2,670.00 WAUGBO434BN101042 1491 82 Cad Ber 60092
20,515.00
835.00 1498 82 Cad Seville 681954
22,860.00
924.00 1499 82 Cad Eldo 601345
19,220.00
788.00 1500 82 Cad Seville 682648
22,510.00
910.00 1501 82 Cad Seville 682648
22,550.00
950.00 1505 82 Lin Cont 612800
22,180.00
964.00 1506 82 Lin Cont 4612799
22,491.57
987.57 1507 82 Cad Seville 682197
23,292.00
556.00 1508 82 Cad Seville 683964
22,815.00
569.00 1509 82 Cad Seville 684145
22,735.00
489.00 1511 82 MB 380SEL 022080
45,985.00
2,865.00 1517 82 Lin Mark 601288
21,768.44
502.44 1518 82 Cad Eldo 611938
21,185.00
213.00 1519 82 Cad Eldo 612197
19,840.00
828.00 1526 82 Cad Eldo 614817
20,980.00
80.00 1527 82 Cad Eldo 614824
21,010.00
10.00 1529 82 Cad Limo 138988
26,390.00
10.00 1532 81 DeLorean Coupe 0059936
24,375.00
200.00 797,184.15
80,885.07 [sic]
*343 Lease #
"Balance Due"
1400 $ 7,020.00  1401 --  1404 9,056.03
1407 18,096.00
1409 6,960.00
1410 7,394.49
1414 8,007.83
1415 9,637.98
1416 8,533.55
1417 7,711.72
1419 19,153.68
1420 15,001.81
1423 5,330.00
1426 13,817.03
1431 14,186.00
1434 6,728.63
1435 10,637.49
1436 9,832.86
1451 8,474.00
1452 8,804.00
1456 --  1462 10,609.00
1464 7,832.00
1468 15,225.22
1473 8,501.00
1477 6,838.76
[sic]
1479 15,440.00
1480 9,154.00
1481 16,609.00
1484 9,246.00
1487 12,420.00
1491 19,680.00
1498 21,936.00
1499 18,432.00
1500 21,600.00
1501 21,600.00
1505 21,216.00
1506 21,504.00
1507 21,504.00
1508 22,246.00
1509 22,246.00
1511 43,120.00
1517 21,266.00
1518 20,972.00
1519 19,012.00
1526 20,900.00
1527 21,000.00
1529 26,400.00
[sic]
1532 24,175.00
717,184.15
[sic]
It appears that for each automobile the "Cost" less the "Loan" equals the "Balance Due". The record does not otherwise reveal how the "Cost", "Loan", or "Balance Due" amounts were determined. Prior *344 to the subject transaction, each of the above 49 automobiles had been purchased by LUC and had been placed in service in its business of leasing automobiles. The record contains a copy of LUC's invoice for 25 of the 49 automobiles involved in the subject transaction. The record does not contain copies of the invoices for LUC's purchase of 24 automobiles. Set out below is a schedule of LUC's cost of the 25 automobiles for which there are invoices in the record. For purposes of comparison, the following schedule also shows Nash's "Cost" for each of the vehicles taken from the document attached to the Bill of Sale, and the difference between the two amounts: Lease #
LUC's Cost Bill of Sale
Difference
1400
No invoice
$ 8,884.37  --   1401
No invoice
4,530.98
--   1404
$ 10,281.29 10,233.79
$ 47.50    1407
23,239.54
23,539.54
(300.00)
1409
10,341.30
9,900.00
441.30 1410
No invoice
9,309.54
--   1414
No invoice
9,215.59
--   1415
11,206.00
11,000.00
206.00 1416
9,680.01
9,667.51
12.50 1417
8,298.64
8,336.84
(38.20)
1419
28,375.00
28,375.00
-0-  1420
16,637.00
16,550.00
87.00 1423
6,715.62
6,548.30
167.32 1426
15,392.00
12,763.00
2,629.00 1431
18,485.00
18,480.00
5.00 1434
7,617.69
7,585.19
32.50 1435
11,557.81
11,500.31
57.50 1436
11,080.87
11,487.87
(407.00)
1451
8,904.69
8,912.19
(7.50)
1452
9,280.09
9,247.59
32.50 1456
5,983.00
5,983.00
-0-  1462
No invoice
11,306.88
--   1464
8,976.50
8,944.00
32.50 1468
No invoice
26,756.00
--   1473
9,050.00
9,050.00
-0-  1477
7,741.50
8,199.00
(457.50)
1479
No invoice
16,000.00
--   1480
9,837.49
10,093.49
(256.00)
1481
20,323.50
17,407.16
2,916.34 1484
8,393.00
9,576.00
(1,183.00)
1487
15,111.00
15,090.00
21.00 1491
No invoice
20,515.00
--   1498
No invoice
22,860.00
--   1499
No invoice
19,220.00
--   1500
No invoice
22,510.00
--   1501
No invoice
22,550.00
--   1505
No invoice
22,180.00
--   1506
No invoice
22,491.57
--   1507
No invoice
23,292.00
--   1508
No invoice
22,815.00
--   1509
No invoice
22,735.00
--   1511
No invoice
45,985.00
--   1517
No invoice
21,768.44
--   1518
No invoice
21,185.00
--   1519
No invoice
19,840.00
--   1526
No invoice
20,980.00
--   1527
No invoice
21,010.00
--   1529
No invoice
26,390.00
--   1532
21,675.00
24,375.00
(2,700.00)
314,183.54
797,184.15
*345 LUC had financed its purchase of each of the subject automobiles but the record does not set forth any details about that indebtedness. On December 30, 1981, the subject 49 automobiles were being used by LUC in its leasing business. Each of the vehicles was under lease to one of LUC's customers. The record of this case contains a portion of the leases covering 31 of the 49 automobiles. We refer to these leases as "end-user leases". One or more pages is missing from each of the end-user leases. Moreover, the record of this case does not contain any part of the end-user leases covering 18 of the 49 automobiles. Set out below is a schedule which shows the lease number for each of the subject automobiles, the date of the lease, the term of the lease, the type of lease, and the residual value stipulated in item 14 of the lease: Residual Lease #
Date of Lease
Term
Type
Value
1400
01/20/81
48
equity
$ 2,973.00
1401
01/22/81
36
equity
1.00
1404
02/10/81
36
net 1407
05/14/82
36
equity
7,665.00
1409
02/02/81
48
equity
2,951.00
1410
02/10/81
36
net 1414
02/16/81
36
net 1415
02/20/81
48
net 3,068.00
1416
03/16/81
36
net 1417
04/06/81
36
net 1419
02/26/81
36
equity
1.00
1420
03/02/81
36
net 1423
03/04/81
36
net 2,003.00
1426
03/06/81
60
net 3,382.00
1431
03/24/81
48
equity
9,138.00
1434
04/07/81
36
net 1435
03/31/81
36
equity
4,133.40
1436
03/31/81
36
net 1451
05/13/81
36
net 1452
05/13/81
36
net 1456
05/22/81
36
net 1462
07/29/81
24
net 1464
06/01/81
36
net 1468
06/15/81
48
net 7,352.00
1473
06/30/81
36
equity
4,600.00
1477
05/14/82
36
equity
3,100.00
1779
No lease
--
-- 1480
07/15/81
36
net 1481
07/07/81
36
equity
1.00
1484
08/18/81
36
net 1487
08/19/81
48
net 1491
No lease
--
--  1498
No lease
--
--  1499
No lease
--
--  1500
No lease
--
--  1501
No lease
--
--  1505
No lease
--
--  1506
No lease
--
--  1507
No lease
--
--  1508
No lease
--
--  1509
No lease
--
--  1511
No lease
--
--  1517
No lease
--
--  1518
No lease
--
--  1519
No lease
--
--  1526
No lease
--
--  1527
No lease
--
--  1529
No lease
--
--  1532
12/28/82
48
equity
8,677.00
*346 We note that leases 1407, 1477, and 1532 are dated after December 30, 1981. Each of the above end-user leases provides that a "Net Lease" is one for which "Paragraph No. 3 [is] Not Applicable" and that an "Equity Lease" is one for which "Paragraph No. 3 [is] Applicable." None of the 31 leases in the record of this case contains the page on which paragraph 3 is set forth. Petitioner and Mr. Inselberg also executed an "Assignment of Leases" under which, "LUC * * * for and in consideration of the sum of $ 10.00 and other good and valuable consideration, * * * does hereby sell, assign, and transfer to Nash Leasing * * * all of its right, title, and interest in certain leases set forth in the annexed schedule". The Assignment of Leases purports to have been executed on December 30, 1981. Attached to the Assignment of Leases is a "Schedule of Assets" which is the same list of 49 automobiles by "Lease #" as attached to the Purchase Agreement. LUC makes the following representations in the Assignment of Leases: (1) The annexed schedule of leases represents bona fide leases in that the lessees in question are in possession of the leased assets. (2) All of the leases set forth *347 in the schedule are in good standing.
LUC also warranted in the Purchase Agreement that the end-user "leases are in good standing". As part of the subject transaction, Nash Leasing and LUC also executed a Lease Agreement dated December 30, 1981, under which LUC purports to lease back the subject 49 automobiles from Nash Leasing for a term of 17 months ending April 30, 1983. The Lease agreement contains the following provision governing the term of the agreement and the rental to be paid: (3) TERM AND RENTAL: This lease is for a term of seventeen (17) months, commencing December 1, 1981, and ending April 30, 1983. The total amount of the rent to be paid by the Lessee to the Lessor in seventeen (17) monthly installments, each due on the first day of each month or in a term hereof, shall be in accordance with the annexed Schedule "B" attached hereto. Interest at the rate of twelve (12%) percent per annum shall be paid on each and every delinquent installment of rent from a date ten (10) days after the due date for such period that the payment remains due and outstanding, together with any reasonable charges and expenses for collection of such delinquent installments, *348 and such amounts shall be in addition to other remedies that the Lessor may have against the Lessee for default in the payment of rent.
As quoted above, the Lease Agreement requires LUC to pay rent in monthly installments "in accordance with the annexed Schedule 'B' attached hereto". However, no Schedule "B" is attached to the version of the Lease Agreement contained in the record of this case. There is no other evidence in the record of the amount of rent payable to Nash Leasing under the Lease Agreement nor is there evidence of any rent paid to Nash Leasing under the Lease Agreement. The Lease Agreement provides as follows: (6) RIGHT TO SUBLET: The Lessor [Nash Leasing] herein grants to the Lessee [LUC] the right to sublease and sublet this equipment to any individual and any party. This obligation on the part of the Lessee to sublet the equipment shall be at the Lessee's obligation and cost. Any such claim and/or obligation with respect to subletting shall be the sole responsibility of the Lessee. It being understood by the Lessor and Lessee that the Lessor will look only to the Lessee's usage of this equipment for purposes of lease obligations. *349 This lease between the Lessor and the Lessee is to be construed as the Lessee being the user of the aforesaid equipment. In the event the Lessee does not utilize such equipment or sublet such equipment, the Lessee's responsibility to the Lessor shall not be diminished whatsoever. * * * (8) INSURANCE: The Lessee hereby indemnifies it [sic] shall hold harmless the Lessor from all loss and damage the Lessor may sustain or suffer by reason of: (a) The loss of or damages to the equipment because of a fire, theft, collision, lightning, flood, wind storm, explosion, or other causality [sic]; (b) The death of [sic] injury to the person or property of any third person as a result, in whole or part, of the use or maintenance of the equipment during the term of this lease; and the Lessee shall procure at Lessee's cost and expense, a policy or policies of insurance issued by a company satisfactory to the Lessor with premiums prepared thereon, insuring the Lessee against the risks and hazards specified in subparagraph (a) above to the extent of the full value of the equipment and against the risks and hazards specified in the annexed Schedule "C" hereof; (c) Such policy *350 or policies shall name the Lessor, or the Lessor's agent, as a named beneficiary and/or as a loss payee. In the event of a cancellation of any policy or policies, the Lessor will receive thirty (30) days written notice of the same; (d) Failure by a Lessor to procure such insurance will not affect the lease obligations of the Lessee under the terms hereof, and the loss, damage to, or destruction of the equipment shall not terminate this lease nor, except to the extent that the Lessor is actually compensated by insurance paid for by the Lessee, as herein provided, relieve the Lessee from the Lessee's liability hereunder. Should the Lessee fail to procure or maintain the insurance provided for herein, the Lessor shall have the option, but not the obligation to do so for the account of the Lessee. In the event payment for procuring or maintaining such insurance is made by the Lessor, the Lessee shall reimburse the Lessor within ten (10) days after receipt of an invoice thereof, and the failure to make such reimbursement when due shall be deemed a default within the terms of paragraph 9 hereof.
As part of the subject transaction, petitioner and LUC executed a Nominee Agreement *351 dated December 30, 1981, under which petitioner authorized LUC to hold legal title to the assets of Nash Leasing and LUC agreed to hold such assets. The Nominee Agreement was subject to certain terms and conditions, among which are the following: (1) NASH LEASING shall own the equipment as set forth in and described in the leases annexed hereto as Schedule "A". * * * (4) The nominee is authorized to receive the income and rents from the leased vehicles, manufacturing and office equipment, boats, etc.; pay the expenses thereof and distribute the income to the partners of the Proprietorship and such periodic intervals as it shall determine in the exercise of its sole discretion. * * * (6) The nominee shall be liable only for its own fraud and bad faith and not for any error in judgment or any mistake of law or fact or any act done in good faith and any one not a party to this agreement shall have no rights whatsoever against the nominee for any action taken or not taken by it. Each Limited Partner in the Proprietorship shall in proportion to this or her interest, indemnify the nominee against loss or liability to which it may be subject on account of acting as *352 nominees hereunder. (7) This agreement shall terminate pursuant to the terms and conditions set forth in the Agreement of Proprietorship entered into between the General Partner and the Limited Partners of the Proprietorship and all the terms thereof are incorporated herein by reference. [Emphasis supplied.] * * *
Contrary to the above paragraph (1), there are no leases annexed to the Nominee Agreement as Schedule "A". Similarly, the record of this case does not contain the Agreement of Proprietorship referred to in paragraph (7) of the Nominee Agreement. Petitioner and Mr. Inselberg also executed an "Agency Agreement" dated December 30, 1981. Under this agreement, petitioner appointed LUC as agent of Nash Leasing "to purchase and obtain leases of automobiles" and other suitable assets. The Agency Agreement authorizes LUC to maintain title to the automobiles and other assets in its name, as the nominee of Nash Leasing. The Agency Agreement is for a term lasting until April 30, 1983, unless terminated earlier by Nash Leasing. For the year 1981, the Agency Agreement provides that Nash Leasing is to pay LUC $ 10,000 for establishment of the agency, and $ 25,000 *353 for placing the automobiles on lease. For the year 1982, the agreement provides that Nash Leasing is to pay LUC $ 25,000 for placing the automobiles on lease. The Agency Agreement further provides that, as additional compensation for handling "the sale and disposition of certain assets owned by the proprietor", LUC is to receive 50 percent of the amount by which the selling price of any vehicle exceeds the outstanding indebtedness on the vehicle. The record contains an unexecuted copy of a "Management Agreement" dated December 30, 1981, between Nash Leasing and LUC. Under this document, Nash Leasing appoints LUC to manage its business and appoints LUC as its agent in connection with the purchase, lease, and sale of the automobiles and other assets. The Management Agreement provides that LUC will perform all duties relating to "the purchase, the financing of such purchase, and the lease, maintenance, and sale of the leased assets of the Proprietorship." The term of the Management Agreement was to continue until April 30, 1983, unless terminated earlier by Nash Leasing. For the year 1981, the Management Agreement provides that Nash Leasing is to pay LUC $ 50,000 for services rendered *354 as manager of operations, $ 10,800 for insurance coverage, and $ 3,600 for bookkeeping and advertising. For the year 1982, the agreement provides that Nash Leasing is to pay LUC $ 35,000 as compensation for acting as manager. In addition to the above compensation, the Management Agreement provides that Nash Leasing and LUC shall divide the "net cash flow from all operations", 66-2/3 percent to LUC, and 33-1/3 percent to Nash Leasing. For this purpose, cash flow is defined as "the gross monthly rentals less outstanding loan payments." In summary, the Management Agreement and Agency Agreement provide that Nash Leasing will pay the following cash fees to LUC: Description 1981 1982 Total Agency Fee
$ 10,000
-- $ 10,000 Placement Fee
25,000
$ 25,000
50,000
Management Service Fee
50,000
35,000
85,000
Insurance
10,800
-- 10,800
Bookkeeping and
Advertising Fee 3,600
-- 3,600
Totals
99,400
60,000
159,400
In addition, the Management Agreement provides that Nash Leasing and LUC will divide "the net cash flow from all operations", 66-2/3 percent to LUC and 33-1/3 percent to Nash, and the Agency Agreement provides that *355 LUC is to receive "fifty (50%) percent of the selling price over and above the outstanding indebtedness on any vehicles owned by the proprietorship". On the same day that the above documents were executed, December 30, 1981, petitioner issued five checks to LUC as follows: Check Number
Amount Notation 743 $ 3,600 Administrative Cost
and Bookkeeping
832 10,800
Insurance
833 10,000
Administrative Fee and License
834 20,000
-- 835 30,000
Management and Administrative Total
74,400
Petitioner also executed a negotiable promissory note dated December 31, 1981, in the principal sum of $ 85,000 payable to LUC on March 31, 1982, with interest at the rate of 12 percent per year. The total of the amounts paid by check, $ 74,400, and the principal amount of the promissory note, $ 85,000, equals the total of the specified cash payments required under the Management and Agency Agreements, $ 159,400. The 49 automobiles allegedly purchased by petitioner included 17 automobiles that LUC had leased to a Japanese national, Mr. Koichi Ishihara, trading as Century Commerce Corp., or to a corporation of which Mr. *356 Ishihara was a stockholder, Century Commerce Corp., Inc. (hereinafter Mr. Ishihara and his corporation are sometimes collectively referred to as Century Commerce). The automobiles leased to Century Commerce are the following: Lease #
Description
"Cost" 1491
82 Cad Ber 60092
$ 20,515.00 1498
82 Cad Seville 681954
22,860.00
1499
82 Cad Eldo 601345
19,220.00
1500
82 Cad Seville 682648
22,510.00
1501
82 Cad Seville 682648
22,550.00
1505
82 Lin Cont 612800
22,180.00
1506
82 Lin Cont 4612799
22,491.57
1507
82 Cad Seville 682197
23,292.00
1508
82 Cad Seville 683964
22,815.00
1509
82 Cad Seville 684145
22,735.00
1511
82 MB 380SEL 022080
45,985.00
1517
82 Lin Mark 601288
21,768.44
1518
82 Cad Eldo 611938
21,185.00
1519
82 Cad Eldo 612197
19,840.00
1526
82 Cad Eldo 614817
20,980.00
1527
82 Cad Eldo 614824
21,010.00
1529
82 Cad Limo 138988
26,390.00
398,327.01
We note that the aggregate "Cost" of the vehicles leased to Century Commerce, $ 398,327.01, is 49.97 percent of the "Cost" of all of the vehicles which petitioner allegedly purchased from LUC. In early January of 1982, petitioner was informed that a number *357 of automobiles which had been leased to Century Commerce, including the 17 listed above, were missing and perhaps had been stolen. Mr. Amdur's law firm represented LUC in this matter and on January 11, 1982, based upon pleadings filed by Mr. Amdur's law firm, the United States District Court for the District of New Jersey entered an Order to Show Cause Ex Parte in which the court temporarily froze the assets of Century Commerce and Mr. Ishihara, and restrained them from leaving the United States. The court's order further restrained the defendants from selling or taking any other action with respect to the 57 automobiles which Century Commerce leased from LUC, including the automobiles involved in the subject transaction with petitioner, and it directed the defendants to file a complete accounting of the location of each of the vehicles. The District Court's temporary restraining order was based upon a verified complaint filed on behalf of LUC, to which there was attached the Affidavit of Mr. Robert Inselberg. In his affidavit, Mr. Inselberg recounts the difficulties which LUC had encountered in leasing automobiles to Century Commerce, including the fact that at least four checks *358 dated November 24, 1981, and December 18, 1981, had been returned by the bank for insufficient funds or were not paid by the bank. These problems are noted on LUC's payment cards for the affected vehicles. Mr. Inselberg's affidavit also recounts the fact that Century Commerce had allowed insurance coverage on 37 of the vehicles to lapse and LUC was forced to obtain insurance for the vehicles. In this connection, we note that Mr. Inselberg had received a cancellation notice dated October 13, 1981, for an insurance policy which had been written by Selected Risks Insurance Co. On January 26, 1982, an amended complaint was filed by Mr. Amdur's firm on behalf of LUC in which LUC demanded the return of the vehicles, compensatory damages, and punitive damages. Exhibit "A" of the amended complaint is a list of the 57 lease agreements which had been entered into between LUC and Century Commerce. Of the lease agreements on that list, 17 involved automobiles which were allegedly sold to petitioner. The Amended Complaint states that "Plaintiff [LUC] is the owner of all the vehicles set forth therein." The Amended Complaint makes no mention of petitioner or Nash Leasing, nor does it *359 mention any interest of petitioner or Nash Leasing in any of the stolen automobiles. On January 8, 1982, LUC arranged to have all the automobiles which were leased to Century Commerce covered under one insurance policy issued by Dover Insurance Co. However, the policy did not cover the missing automobiles. Although LUC was required under the Lease Agreement to obtain insurance for all of the 49 automobiles allegedly leased back from Nash Leasing, it failed to insure the following 10 automobiles stolen by Century Commerce: 1491, 1498, 1499, 1500, 1501, 1505, 1506, 1517, 1518, 1529. We note that one of the exhibits to the Amended Complaint is described as "an exemplar of the leases that defendant, Ishihara, executed." That lease provides that a "Net Lease" is one in which "Paragraph No. 3 [is] not Applicable" and an "Equity Lease" is one in which "Paragraph No. 3 [is] Applicable". Paragraph 3 of that lease states as follows: LEASE END RESPONSIBILITY OF LESSEE. Upon the expiration of the term of this lease, the vehicle shall be promptly sold by Lessor. If the proceeds of such sale are less than the residual value (Item 14) for such vehicle specified, the Lessee shall *360 promptly remit the difference to the Lessor as an additional rental. If such net sale proceeds exceed such residual value, and Lessee has paid all sums for which Lessee is reponsible [sic] hereunder, Lessor shall pay such difference to the Lessee as a refund of rentals.
Leasing Unlimited Corporation -- 1983 Agreement
Petitioner and Mr. Inselberg executed a second Lease Agreement dated June 30, 1983. The Lease Agreement states that "the Lessor [Nash Leasing] desires to lease said equipment and/or personal property more fully described in the annexed Schedule 'A' hereto." The version of the Lease Agreement contained in the record of this case contains no Schedule "A" annexed thereto. The 1983 Lease Agreement further provides that it is for a term of 17 months, commencing July 1, 1983, and ending December 31, 1984, and that LUC, the lessee, is to pay rent in 17 monthly installments "in accordance with the annexed Schedule 'B' attached hereto." The version of the Lease Agreement contained in the record of this case contains no Schedule "B" annexed thereto. The other terms of the 1983 Lease Agreement are similar to the 1981 Lease Agreement described above. *361 Manhattan Leasing Systems
On October 22, 1983, petitioner signed an "Agreement" with Manhattan Leasing Systems, Inc. (hereinafter Manhattan) which provides that Manhattan, as manager, was to arrange, on behalf of Nash Leasing, for the purchase of $ 800,000 of new automobiles in 1983. Petitioner designated Manhattan as its agent to purchase and lease the automobiles, collect rents, and sell or repossess the automobiles upon the expiration or early termination of the leases. Pursuant to the agreement, Manhattan was required to insure the automobiles. Further, the agreement provides that "All leases obtained by the Manager [Manhattan] on behalf of the Company [petitioner] shall be for new automobiles such that the Investment Tax Credit belongs to the lessor [petitioner]." As compensation, Manhattan was entitled to a commission of 5 percent of the "capitalized cost" of the automobiles purchased, financed, insured, and leased. For management and administrative services, Manhattan was to receive $ 52,000 during 1983, $ 24,000 payable on March 31, 1984, and $ 12,000 payable on February 15, 1985. In addition, Manhattan and petitioner were to divide the "net cash flow" from *362 all operations, 80 percent to Manhattan and 20 percent to petitioner. For this purpose, the agreement defines cash flow "as the gross monthly rentals less outstanding loan payments, $ 10.00 per month administrative charge, bookkeeping and management cost therein." Finally, Manhattan was to receive 50 percent "of the net selling price (sale proceeds) over and above the greater of the outstanding indebtedness or balloon payment due on any lease termination". This amount was to be paid as commission on the sale and disposition of the subject automobiles owned by petitioner. Petitioner's alleged Agreement with Manhattan also provides as follows: None of the above payments [of compensation to Manhattan] shall be made until the Manager [i.e., Manhattan] delivers to the Company [i.e., Nash Leasing] written verification including duplicate invoices, leases, financing agreement and insurance coverage indicating that new automobiles with a capitalized cost of approximately Eight Hundred Thousand ($ 800,000.00) Dollars have been purchased, leased, financed and insured pursuant to this Agreement.
The record of this case does not contain any such written verification *363 from Manhattan nor does it contain "duplicate invoices, leases, financing agreement and insurance coverage." Petitioner signed a "Negotiable Promissory Note" promising to pay Manhattan $ 24,000 on March 31, 1984. The note is not dated. The record does not contain any document evidencing the payment of this note. Petitioner executed a "Loan and Security Agreement (Motor Vehicles)" dated October 17, 1983. This document sets forth the terms under which petitioner would agree to borrow money from Tilden Commercial Alliance, Inc. (hereinafter Tilden) to finance the acquisition of automobiles. The document which was signed "Nash Leasing By: Ronald S. Nash Sole Proprietor" provides in part: We intend but are not obliged to request you [Tilden] to advance, in your discretion, all or part of the cost of motor vehicles purchased or to be purchased by us and leased to Lessees. Each advance shall be evidenced by a Loan Receipt and Lease Assignment (herein called an "Instrument") signed by us specifying the amount, terms of payment and motor vehicle financed thereby.
The record of this case does not contain a Loan Receipt or Lease Assignment or any other evidence that *364 Tilden made any advance to petitioner under the terms of the Loan and Security Agreement which was not executed by Tilden. Petitioners' Income Tax Returns
Petitioners attached to each of the tax returns in issue a Schedule C, Profit or (Loss) From Business or Profession, in the name of "Ronald S. Nash & Nash Leasing" or "Ronald Nash T/A Nash Leasing". Each of the Schedules C combines Mr. Nash's income from stock trading with the income and expenses from his alleged leasing business under the name Nash Leasing. Petitioners reported the following income from Nash Leasing on the Schedules C: 1981
1982
1983 Gross receipts
--
$ 137,012
$ 42,574
Form 4797 profit
on sale --
--   25,027
Total income
--
137,012
67,601
We note that petitioners reported gross receipts of $ 531,366 on the Schedule C filed for 1981. However, $ 1,620 of that amount is attributable to another rental transaction and the remainder, $ 529,746, was earned in petitioner's business of trading stock. Thus, none of the gross income reported for 1981 is attributable to the business of Nash Leasing. The item reflected above as "Form 4797 Profit on Sale" refers *365 to a gain of $ 25,027 which was reported by petitioners on Form 4797, Supplemental Schedule of Gains and Losses, filed with their 1983 return. On that form, petitioners reported the source of the gain as "Sale of Leased Equipment - Motor Vehicles" which had been acquired in 1981 for $ 712,010. Petitioners also reported a gain of $ 7,584 on a Form 4797 filed with their 1982 return but did not report the gain on the Schedule C attached to their 1982 return. The source of that gain was the sale of four automobiles which had been acquired in 1981 for $ 85,174. We note that the aggregate basis of the motor vehicles involved in those two sales is $ 797,184 (i.e., $ 712,010 plus $ 85,174), the amount petitioner allegedly paid to LUC for the subject 49 automobiles. The following is a summary of the deductions claimed by petitioners on the Schedules C filed with their returns for the subject years: 1981
1982
1983
Commissions
$ 25,000 $ 12,000 $ 13,593 (lease placement) Depreciation
200,127
270,564
330,683
Insurance
10,800
3,600
3,600
Interest
-- 65,874
20,848
Legal and
10,050
-- 5,000
professional fees Home office
2,650
2,400
-- Advertising and
3,600
3,600
3,600
bookkeeping Lease management fee
50,000
35,000
67,500
Lease processing fee
-- 9,472
2,100
Agency fee
10,000
25,000
-- Administrative costs
-- -- 12,107
Travel & entertainment
1,108
-- -- Licenses and
-- -- 1,660
registration Total deductions
313,335
427,510
460,691
*366 For 1981, petitioners treated the amount allegedly paid to LUC for the subject 49 automobiles as their basis in "recovery property" within the meaning of section 168(c)(1). They treated the automobiles as "3-year property", as defined by section 168(c)(2)(A), and they claimed depreciation deductions of $ 199,296 in 1981 (i.e., 25 percent of $ 797,184) and $ 270,564 in 1985 (i.e., 38 percent of $ 712,010). We note that respondent determined that $ 831 of the depreciation claimed for 1981 is attributable to a transaction other than the alleged transaction between Nash Leasing and LUC. Petitioners claimed no depreciation on the 49 automobiles in 1983. This is consistent with the fact that they reported the sale of four of the automobiles in 1982 (i.e., $ 85,174) and the sale of the remainder of the automobiles in 1983 (i.e., $ 712,010). For 1981, petitioners also treated the 49 automobiles as "new section 38 property", within the meaning of section 48(b), and included the amount allegedly paid for the automobiles in their computation of "qualified investment" for purposes of computing investment credit. See sec. 46(c). On this basis, petitioners computed a tentative investment *367 credit of $ 50,831. This amount was reduced to $ 38,054 by reason of the limitation imposed by section 38(c) based on the amount of tax. For 1983, petitioners claimed depreciation deductions of $ 330,683 on the Schedule C filed with their return. A Form 4562, Depreciation and Amortization, filed with the return reports that this deduction is based on recovery property allegedly placed in service in 1983, as follows: Date Placed
Recovery
Deduction for
in Service Other Basis
Period
Method
Percentage
this Year
1983
$ 776,267
3 years
ACRS
25%
$ 194,067
1983
546,462
3 years
ACRS
25%
136,616
Total
330,683
Petitioners computed a tentative investment credit for 1983 in the amount of $ 92,142. Of this amount, $ 36,565 is based upon the rehabilitation of certain historic structures. The tentative credit for 1983 was reduced to $ 82,071 by reason of the limitation imposed by section 38(c) based on the amount of tax. Respondent made a number of adjustments to petitioners' returns for 1981, 1982, and 1983. The principal adjustment is the disallowance of the tax benefits based upon petitioner's alleged automobile leasing *368 business. Respondent disallowed the investment credit claimed in 1981 of $ 38,054 and reduced the investment credit claimed in 1983 to $ 36,565, the amount attributable to the rehabilitation of certain historic structures. Respondent also disallowed $ 986,888 of the aggregate deductions claimed on the Schedules C filed for the years at issue. In effect, respondent allowed the deductions claimed to the extent of the income reported on the Schedules C and Forms 4797. Respondent computed the amount disallowed as follows: 1981
1982
1983
Total Total deductions
$ 313,335
$ 427,510
$ 460,691
$ 1,201,536
Depreciation
831
Gross receipts
1,620
137,012
42,574
Gain on sale of autos
7,584
25,027
Amount allowed
2,451
144,596
67,601
214,648
Amount disallowed
310,884
282,914
393,090
986,888
The notice of deficiency gives the following explanation for these adjustments: 1. For purposes of Federal income taxation you cannot be considered the owner of the equipment with respect to which said items of deductions, losses, and credits are reported since, after examination of all facts and circumstances, you are found not to have *369 incurred the benefits and burdens of ownership of the equipment or to have made, in substance, a true economic investment [sic] in said equipment. Alternatively, if it is determined that you were the owner of the equipment for federal income tax purposes during the year 1981, 1982 & 1983, then it is determined that the acquisition and lease of said equipment was not an activity which constituted a trade or business. 2. In addition, the claimed deductions, losses, and credits are disallowed because the amount and character of such deductions, losses, and credits have not been established including but not limited to the failure to establish: (a) that the alleged events, transactions, and expenditures ever occurred in fact or in substance, (b) That the venture or its underlying events or transactions were entered into for profit, arose in a trade or business, or that the assets were held for the production of income. (c) The adjusted bases of property allegedly subject to depreciation and/or amortization, the useful life of such property and the method of depreciation. (d) That any non-recourse and/or contingent financing should be considered in *370 determining adjusted bases in any property or right to property acquired and/or used in connection with the alleged venture. (e) That any interest expenses allegedly incurred or paid in this venture are not contingent obligations lacking in economic substance. Alternatively, if it is determined by a Court of competent jurisdiction that the disallowed items, loss and deduction and credits arising from the investment in automobiles are allowable in whole or in part for the taxable years 1981, 1982 and 1983, then it is determined that any loss and/or deductions which you might be entitled to claim is limited to the amount at risk (as determined pursuant to section 465 of the Internal Revenue Code at the close of the 1981, 1982 and 1983 taxable years. Further, taxpayer failed to take depreciation using the half-year conventions. See Tres. [sic] Regs. 1.167(a)-11(c)(2)(ii) and 1.167(a)(11(f). Accordingly, for the first year the equipment is placed in service the depreciation is limited to the actual days that the property was actually in service.
Respondent also determined in the notice of deficiency that petitioners had failed to report *371 interest income of $ 8,271 in 1981. The notice of deficiency states as follows: (e) It is determined that you received additional interest income of $ 8,271.00 during the taxable year 1981 which was not reported on your 1981 return. Therefore, your taxable income is increased by $ 8,271.00 as shown below.
Reported As Corrected
Adjustment
Citibank N.A.
$ 3,347.00
$ 3,537.00 $ 190.00   First Jersey National Bank
-0-  4,986.00
4,986.00
First Jersey National Bank
-0-  3,095.00
3,095.00
Total    $ 3,347.00
$ 11,618.00
$ 8,271.00
OPINION 1. Automobile Sale-Leaseback Transactions
For the years in issue, 1981 through 1983, petitioners claimed aggregate deductions of $ 1,201,536 on the Schedules C, Profit or (Loss) From Business or Profession, filed with their Federal income tax returns. Petitioners also claimed aggregate investment credits of $ 120,125 on Forms 3468, Computation of Investment Credit, filed with their returns for 1981 and 1983. The principal adjustments made by respondent in the notice of deficiency are: (1) The disallowance of $ 986,888 of the deductions claimed on the subject *372 Schedules C and (2) the disallowance of $ 83,560 of the investment credits claimed on the Forms 3468. Respondent based these adjustments on a number of reasons, including the determination that petitioners had not made "a true economic invest-ment [sic] in said equipment", nor had they established "that the alleged events, transactions, and expenditures ever occurred in fact or in substance". In effect, respondent determined that petitioner's automobile leasing transactions were economic shams, that is, transactions entered into for the sole purpose of obtaining tax benefits and devoid of economic substance. See generally Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); DeMartino v. Commissioner, 862 F.2d 400, 406 (2d Cir. 1988), affg. T.C. Memo. 1986-263; Levy v. Commissioner, 91 T.C. 838, 853-854 (1988); Cherin v. Commissioner, 89 T.C. 986, 992-994 (1987); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 209-210 (1983), affd. in part and revd. in part 752 F.2d 89, 91 (4th Cir. 1985). Petitioners argue that the tax benefits at issue stem from the three *373 automobile leasing transactions described above, and that respondent was wrong to disallow those benefits in the notice of deficiency. As to respondent's determination that the transactions were shams, petitioners argue that Mr. Nash entered into each of the transactions solely for sound business purposes and that respondent incorrectly determined that the transactions were devoid of economic substance. Petitioners argue that Mr. Nash's "subjective purpose for entering into the leasing transactions in 1981 and 1983 was without a doubt business motivated." As evidence of his business motivation, petitioner relies on his testimony, the testimony of his tax attorney Sanford Amdur, the testimony of the president of LUC, Mr. Inselberg, and the testimony of a representative of Manhattan. Petitioners argue that the 1981 automobile leasing transaction took place at a time when petitioner was seeking to diversify his investments because of "problems facing Wall Street generally in 1980 and 1981". According to petitioners, Mr. Nash approached the automobile leasing transactions in a businesslike manner. He reviewed the projections prepared by Mr. Amdur in June of 1981, and he spent hours *374 "with Amdur and with bankers, Inselberg, Inselberg's accountant, and at least one other potential leasing person whom he rejected, as well as several friends knowledgeable in the leasing business." According to petitioner, he personally reviewed leases, account payment cards, and invoices, and hand-picked the automobiles that he wished to purchase. Petitioners also argue that there was economic substance to the automobile leasing transactions. They argue that through his negotiations with Mr. Inselberg, Mr. Nash paid the "wholesale price" and, in some cases, less than the wholesale price for the cars. They assert that a premium would have been appropriate given the fact that all of the cars were already subleased to third parties. They argue that Mr. Nash's debt obligations in these transactions were "recourse" obligations and that he acquired "100% equity in the automobiles." They argue that the fees paid in the transactions are common in the industry and that Mr. Nash relied upon the cash flow projection made by Mr. Amdur and he relied upon the advice which he received from Messrs. Inselberg and Amdur "with regard to the automobiles' residual value". Petitioners, of course, *375 bear the burden of proving that they are entitled to the deductions and credits claimed in their tax returns. Rule 142(a), Tax Court Rules of Practice and Procedure. (Hereinafter, all Rule references are to the Tax Court Rules of Practice and Procedure.) In a case such as this, where respondent determines that a purported business transaction is a sham, petitioners must show that Mr. Nash had a business purpose for engaging in the transaction, other than tax avoidance, and they must prove that the transaction had economic substance beyond the creation of tax benefits. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628; Shriver v. Commissioner, 899 F.2d 724, 727 (8th Cir. 1990), affg. T.C. Memo. 1987-627. We find that the record in this case does not contain sufficient information to permit the Court to analyze whether Mr. Nash entered into any of the three transactions at issue for sound business reasons, apart from the tax benefits involved, or whether any of the transactions was supported by economic substance. Significantly, the record does not contain sufficient information to *376 permit the Court to analyze the economics or profit potential of any of the three transactions at issue. Accordingly, we find that petitioners have failed to meet their burden of disproving respondent's determination that the transactions were shams, and we sustain respondent's disallowance of the subject deductions and investment credits without addressing the other reasons presented by respondent in the notice of deficiency. 1981 Transaction With LUC
Petitioners have introduced into the record a variety of documents purporting to create a sale-leaseback transaction between Mr. Nash, acting as Nash Leasing, and LUC. There are a number of reasons why we are skeptical that any such transaction took place as claimed by petitioners. First, we note numerous inconsistencies in petitioner's testimony at trial. For example, petitioner testified that he made a thorough study of the leasing business which, he said, was to be his "livelihood". Nevertheless, he was unable to state the difference between a "net lease" and an "equity lease" or explain the impact of each type of lease on the transaction with LUC. In passing, we note that in the context of this case, an "Equity *377 Lease" is a lease under which the lessor and lessee agree at the start of the lease term on "the residual value" of the vehicle. At the end of the lease term, if the proceeds of the sale of the vehicle are less than the agreed residual value, then the lessee is required to pay the difference to the lessor as additional rent. On the other hand, if the proceeds from the sale of the vehicle exceed the agreed residual value, then the lessee receives the excess as a refund. In this case, 11 of the 31 end-user leases produced by petitioners are equity leases. Petitioner's failure to appreciate the difference between the type of end-user leases employed by LUC is all the more significant in view of the importance which petitioner placed on the residual value of the automobiles. He testified: "the big icing on the cake is the fact that the residual value of the automobiles is where -- that's the game, that's the goodness of the whole thing really." Another inconsistency in petitioner's testimony is the fact that petitioner testified that he and Mr. Amdur conducted "a thorough, thorough due diligence". Petitioner testified at length that he hand picked the automobiles which he purchased *378 from LUC after reviewing end-user leases, LUC's account payment cards, and invoices. We are skeptical that any such due diligence took place in view of the difficulties which arose shortly after the alleged transaction involving the automobiles leased to Century Commerce, comprising approximately 50 percent by "Cost" of the automobiles allegedly purchased from LUC. The pleadings from LUC's civil action against Century Commerce describe the fact that Century Commerce had issued checks to LUC with insufficient funds and had failed to pay required insurance premiums beginning in October of 1981. Another inconsistency involves petitioner's testimony that he purchased additional insurance against the loss of the automobiles allegedly purchased from LUC. He testified as follows: If there was any way I could cut my exposure down, I would cut my exposure down. I went out and got additional insurance above and beyond the normal course of insurance that Inselberg, and a normal operation, provides. I told him I wanted additional insurance for unknown reasons, maybe something could happen. I wanted to make [sure] all these cars are totally protected if I had to reinsure, I guess *379 it would be called, or double insure, to make sure that I was covered all the way around. And that was not under the normal ways of business of the normal leasing operation. I went out and got additional insurance. They said I was crazy, but let them say I was crazy. I felt comfortable. I didn't want to be on line for $ 800,000.
Petitioner's 1981 income tax return lists a deduction for insurance in the amount of $ 10,800, the amount allegedly paid to LUC for insurance, but, significantly, it shows no other deduction for insurance. Petitioner's testimony raises the question why he did not collect on the additional insurance with respect to the automobiles allegedly stolen by Century Commerce. There are many other examples of inconsistences which we could highlight. We also found petitioner's testimony to be vague, evasive, and, on the whole, unbelievable. Suffice it to say that we do not credit petitioner's testimony in this case. Similarly, we found Mr. Amdur's testimony to be vague and conclusory. The second reason why we are skeptical that the alleged leasing transaction with LUC took place is the fact that some of the documents which form a part of the record *380 in this case do not support petitioners' version of the transaction. For example, we are not convinced that petitioner assumed "outstanding indebtedness" of $ 716,299.08 for the 49 automobiles which he allegedly purchased. The Assumption Agreement says only that petitioner was liable for the indebtedness of Nash Leasing. We find nothing in the record which proves that petitioner or Nash Leasing assumed the indebtedness incurred by LUC in purchasing the subject 49 automobiles or assumed any other indebtedness of LUC. Indeed, the record contains no evidence concerning LUC's liabilities or the indebtedness it may or may not have incurred in acquiring the subject 49 automobiles or any other property. We do not know the purpose of the Assumption Agreement in view of the fact that petitioner would automatically be liable for the indebtedness of Nash Leasing, a proprietorship. We note the testimony of Mr. Amdur and Mr. Inselberg that the Assumption Agreement was given to LUC's lenders. However, we also note that there is no documentary evidence to corroborate that testimony. Similarly, we do not know why LUC would have entered into the Lease Agreement dated December 30, 1981, and *381 would have agreed therein to lease back the 49 automobiles for a term of 17 months. The Lease Agreement gave LUC the right "to sublease and sublet this equipment to any individual and any party." However, each of the cars was already subject to an end-user lease which was to run beyond the end of the leaseback term. Moreover, all of the end-user leases were assigned to petitioner, and LUC had agreed in the Management Agreement to act for a fee as agent for Nash Leasing in collecting rents and managing the business of Nash Leasing. Thus, we do not understand why LUC would have agreed to lease back the 49 automobiles when the automobiles were already subject to end-user leases which LUC was being paid to manage. In addition, the Nominee Agreement defines Nash Leasing as the "Proprietorship" but refers to "the partners of the Proprietorship" and refers to "the Agreement of Proprietorship entered into between the General Partner and the Limited Partners of the Proprietorship". The record does not satisfactorily explain this discrepancy. The third reason why we are skeptical that the alleged transaction with LUC took place is the fact that the parties to the alleged transaction do *382 not appear to have followed the terms of the agreements which they executed. For example, the Amended Complaint filed against Century Commerce by attorneys in Mr. Amdur's firm less than 2 weeks after Nash Leasing's alleged purchase of the 49 automobiles states that LUC "is the owner of all of the vehicles" and fails to mention petitioner or Nash Leasing. Similarly, the Lease Agreement under which LUC allegedly leased back the subject automobiles requires LUC to indemnify Nash Leasing for any loss of or damage to the leased equipment and provides "In the event the Lessee [LUC] does not utilize such equipment or sublet such equipment, the Lessees responsibility to the Lessor shall not be diminished whatsoever." The parties apparently disregarded the terms of the Lease Agreement after the loss of 17 automobiles was discovered. Even if we put aside all of the above problems, and take the alleged transaction at face value, however, we must still sustain respondent's determination. Petitioners claim that the 1981 transaction required Mr. Nash to make total payments to LUC of $ 797,184.15 to acquire 49 automobiles and further required him to pay to LUC an aggregate of $ 159,400 over *383 2 years in management and agency agreement fees. Thus, petitioners claim that Mr. Nash was obligated to make payments of $ 956,584.15 (i.e., $ 797,184.15 plus $ 159,400) over 2 years. In return, petitioners claim that Mr. Nash purchased the 49 automobiles enumerated in the attachments to the various agreements, received assignment of each of the end-users leases, and was to receive 17 monthly payments from LUC for its leaseback of the automobiles under the Lease Agreement, plus 33-1/3 of "the net cash flow from all operations" under the Management Agreement, and 50 percent of "the selling price over and above the outstanding indebtedness on any vehicles owned by the proprietorship" under the Agency Agreement. Petitioner explained the "economics of the deal" in the following testimony at trial: You have to look at the aspect of taxes in any business you go into. There are benefits, certain tax benefits, in various situations. But I was looking -- this is strictly -- you've got to look at the economics of the deal. If the economics of the deal doesn't work, then the tax benefits don't mean anything as far as I'm concerned. The way the economics of the deal works, if the *384 cash flow comes out to have a nice return -- and, you know, you can even probably work at a deal where if the cash flow more or less breaks you even almost, as long as when the residual value of the actual deal at the end comes up and there's enough at the end and you're going to want -- that's where you really make out. That's the big score. Or, to be honest with you, there's another score, too. The other score would be, of course, if the leases turn over earlier than their stated period of time. If leases turn over earlier, then there's additional money that's brought in because the lease has to be paid off, and you get an extra two or three months, four months sometimes, and you have to work out if the car sold. So there's big, big -- there's a lot of money and there's a lot of spread involved in these things. One of the things, of course, why Inselberg's deal was quite exciting, Inselberg had the capability, because he dealt in such big cars and big numbers, he was able to make deals with the dealers to buy these cars really, really cheap. That's what reflected a lot of the -- he was able to buy them cheap, and when he sold them out at the end of the lease, he was able *385 to sell them out at retail. Now the spread in there is huge. If you work up the numbers, it's a nice business, once you wind up seeing all the numbers.
The record of this case does not contain sufficient information to permit the Court to evaluate the reasonableness of the amount which petitioner expected to receive under the alleged 1981 transactions with LUC. Thus, the record does not permit us to evaluate whether the transaction presented a reasonable opportunity of producing a profit, exclusive of the tax benefits. See Levy v. Commissioner, 91 T.C. 838, 853-854 (1988); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 209-210 (1983), affd. in part and revd. in part 752 F.2d 89, 91 (4th Cir. 1985). First, the version of the Lease Agreement contained in the record of this case does not include "Schedule 'B'" which, according to the agreement, sets forth the amount of rent to be paid under the lease agreement. In fact, the record provides no information about the rent which LUC was to pay under the Lease Agreement, nor does it prove that any amount was actually paid. Second, the record of this case does not contain *386 a complete lease agreement in the case of any of the 49 end-user leases, and it contains only fragments of the end-user leases covering 31 of the automobiles. Accordingly, it is not possible to determine the aggregate monthly rentals payable under those leases. Without that information, petitioner's anticipated share of the "net cash flow from all operations" cannot be determined and, thus, we cannot determine the amount which it was reasonable to anticipate would be received under the Management Agreement. Moreover, the record contains no documentary evidence of the aggregate monthly rentals which were actually paid. Third, the record of this case does not contain any information concerning LUC's financing of the subject automobiles or the loans which were outstanding on the subject vehicles on December 30, 1981, or the payments required under such loans. Accordingly, we are unable to determine petitioner's share of "the net cash flow from all operations" or petitioner's share of 50 percent of the "selling price over and above the outstanding indebtedness". Thus, we cannot determine the amounts which petitioner anticipated receiving under the Management Agreement or the Agency *387 Agreement. Fourth, the record of this case contains insufficient information about the values of the subject 49 vehicles to evaluate petitioner's vague testimony that he purchased the automobiles "really, really cheap" and expected a "big score" based upon the residual values of the automobiles. We note that Mr. Amdur testified that the cars were "purchased at a cost lower than retail and actually purchased for something a little over wholesale, not much." He suggested that some account was taken of the fact that each of the cars had been operated in LUC's business for several months before the sale to Nash Leasing. We further note that Mr. Inselberg testified that he sold each of the subject automobiles to Nash Leasing for "a wholesale price", that is, "dealer's cost plus a slight markup." We have difficulty accepting any of that testimony in view of the fact that petitioners did not introduce into evidence invoices for LUC's purchase of 24 of the 49 automobiles. Furthermore, in the case of the invoices introduced into evidence, there are significant differences in a number of cases between the price shown on LUC's invoice and the "Cost" reflected on LUC's Bill of Sale to Nash *388 Leasing. In addition, the 49 automobiles had been used in LUC's business for a number of months before the alleged transaction took place and petitioners did not show that LUC's use of the automobiles had been taken into account in valuing them. Moreover, petitioner testified that "the big icing on the cake is the fact that the residual value of the automobiles is where -- that's the game, that's the goodness of the whole thing really." However, the record of this case does not establish petitioner's basis for concluding that the "residual values" of the automobiles at the end of the end-user leases would provide a profit. In order to arrive at that conclusion petitioner testified that he relied on "statistical data". Petitioner explained his methodology in the following terms: A Yes. In order to get through these numbers and to do this whole thing, which is just Amdur and I went through a number of times, you've got to use references, meaning there is a blue book list called, I think it is referred to as something else, but it gives you the idea of what the values of the cars are worth after a certain period of time. Q Was there any other information that was available *389 to you? A Yes. Well, the other information that was available was, well, the values of -- just the basis that the cars themselves were going up in value. There was constantly information in newspapers, constantly articles all over the place that tells you what was happening in the leasing field. That's when there were tremendous big buys -- I'm talking about major, mega bucks -- were passing back and forth between companies in the leasing field, so the newspapers were constantly exposed to what was happening in leasing. So there was constantly articles and constantly things going down that you can constantly refer to from newspapers, magazines, everywhere. That was a hot, a very, very hot time for leasing, which got me more excited about it than anything else.
The record of this case contains none of the information which petitioner allegedly consulted, as described above. Furthermore, the record of this case does not contain any of the books and records which petitioner and Mr. Amdur testified were maintained by Nash Leasing. These allegedly include profit and loss statements, balance sheets, cash receipts and disbursements records and bank records. Similarly, *390 the record of this case does not contain any of the information allegedly sent by LUC to Nash Leasing which Mr. Amdur testified consisted of "either a quarterly or a semiannual report of the lease revenues of the operation, profit, and loss by the operation, and an annual statement." 1983 Transaction With LUC
Petitioner contends that a second leaseback transaction with LUC occurred on June 30, 1983. Under this transaction, petitioners claim that Mr. Nash "purchased $ 550,000 of automobiles that year, which he leased back to LUC." In computing depreciation for 1983, petitioners included unspecified property allegedly acquired in 1983 with a cost basis of $ 546,462. In computing investment credit for 1983, it appears that petitioners also took into consideration certain automobiles with an unadjusted basis of $ 125,000, acquired pursuant to the alleged 1983 transaction with LUC. To substantiate the deductions and credits claimed for the year 1983 with respect to petitioner's alleged transaction with LUC in that year, petitioner relies upon a lease agreement dated June 30, 1983, his own brief testimony that he "put up $ 55,000, $ 53,000, something like that" to purchase *391 "$ 550,000 of automobiles" and that "those leases worked out profitable." Petitioner also relies upon his joint 1986 Federal income tax return which reports net profit of $ 214,230 from the business of Nash Leasing. We find insufficient credible evidence in the record to substantiate that petitioner purchased $ 550,000 worth of automobiles which he used in a leasing business in that year. The Lease Agreement dated June 30, 1983, does not substantiate petitioner's acquisition of any automobiles in the year 1983 and we do not credit petitioner's testimony on that point. Petitioner introduced no documents to substantiate any such purchase such as invoices, bills of sale, canceled checks, or the like. Accordingly, we sustain respondent's determination that petitioners have failed to prove eligibility for the tax benefits allegedly based upon the 1983 transaction with LUC. On brief, petitioner argues that the 1983 transaction is a continuation of the one in 1981 and that the parties are bound by the earlier agreements. Petitioner relies on the "Lease Agreement" dated June 30, 1983, to support his contention. However, the 1983 Lease Agreement does not even mention the 1981 Lease *392 Agreement, and in no way does it support the argument that it is a continuation of an earlier agreement. Moreover, the 1983 Lease Agreement states that the "equipment and/or other personal property" covered by the agreement is "described in the annexed Schedule 'A' hereto". No Schedule A is attached to the 1983 Lease Agreement. The Manhattan Leasing Systems Transaction
Petitioners allege that Mr. Nash entered into a transaction with Manhattan on October 22, 1983, under which Manhattan, acting as petitioner's agent, financed the purchase of $ 800,000 worth of automobiles through Tilden Commercial Alliance, Inc., insured the automobiles and leased them to third parties. As mentioned above, petitioners claimed depreciation on property allegedly acquired in 1983 with a cost basis of $ 776,267, and they claimed investment credit on new property allegedly acquired in 1983 with an unadjusted basis of $ 800,578. Petitioners bear the burden of proving that they are entitled to the tax benefits claimed. Rule 142(a). The evidence contained in the record of this case fails to substantiate petitioners' claim that Mr. Nash purchased $ 800,000 worth of automobiles through Manhattan *393 in 1983. First, there is nothing to substantiate petitioners' claim that Mr. Nash financed the purchase of $ 800,000 worth of automobiles through Tilden Commercial Alliance, Inc. There is no documentary evidence to show that any advance was made in accordance with the terms of the Loan and Security Agreement (Motor Vehicles) dated October 17, 1983, introduced by petitioners. Second, the agreement with Manhattan dated October 22, 1983, requires Manhattan to deliver to Nash Leasing "written verification including duplicate invoices, leases, financing agreement, and insurance coverage indicating that new automobiles with a capitalized cost of approximately Eight Hundred Thousand ($ 800,000.00) Dollars have been purchased, leased, financed, and insured pursuant to this Agreement." No such written verification or other documents specified are contained in the record of this case. We note that Mr. Robert Allgier, assistant controller of Manhattan, testified that a transaction occurred between petitioner and Manhattan during 1983. The heart of Mr. Allgier's testimony is as follows: A Exhibit 23-W is an agreement between Nash Leasing and Manhattan Leasing Systems. Q Excuse *394 me. At what time? When? A October 22, 1983. Q Did you ever see it? A Yes, I have. Q Was the Nash Leasing transaction of 1983 recorded on the books and records of Manhattan Leasing as manager? A Yes, it is. Q Did Manhattan Leasing act as manager in these transactions? A Yes, they did. Q Did you verify the acquisition? A Yes, we did. Q Did you verify the acquisition of the Nash vehicles? A Yes, we did. Q When? At what time, and how? A Upon the issuance of the check to purchase the automobiles. Q Did you check the check against the -- A Bills of sale. Q What was your procedure for doing that? A We obtain a bill of sale from a car dealership. We issue a check to pay for the vehicle and we obtain the title to the vehicle. We being Nash Leasing would obtain the title. Q Excuse me. Can you repeat that? A I'm sorry. A bill of sale is received from the car dealership to purchase an automobile. A check is cut to purchase the automobile and a title is obtained for the vehicle. Q Who paid for the cars? A Nash Leasing Company. Q And whose check was its? A *395 Nash Leasing. MR. KORNBLATT: I don't have anything else.
We do not accept the above testimony as proof that petitioner acquired $ 800,000 worth of automobiles in 1983 and conducted a leasing business through Manhattan. At most, the above testimony suggests that Mr. Nash purchased one or more automobiles through Manhattan. For example, we could infer from the above testimony that Mr. Nash purchased one or more vehicles for his personal use through Manhattan. Petitioners introduced no bills of sale, titles, canceled checks, promissory notes, or other evidence to substantiate petitioners' claim that Mr. Nash acquired $ 800,000 worth of automobiles for which tax benefits are claimed on petitioners' 1983 Federal income tax return. Accordingly, we sustain respondent's determination that petitioners are not entitled to the tax benefits claimed with respect to the alleged transaction with Manhattan in 1983. 2. Unreported Interest
Respondent determined that petitioners failed to report interest income in the amount of $ 8,271 during 1981. That amount consists of $ 8,081 in interest from two accounts at First Jersey National Bank, and $ 190 from an account at Citibank. *396 Petitioners bear the burden of proving respondent's determination in the notice of deficiency is incorrect. Rule 142(a). With regard to the account at Citibank, petitioners failed to address that item at trial or in their post-trial briefs, and they provided no explanation for their failure to include that amount in income. Therefore, we sustain respondent's determination that petitioners' income should be increased by $ 190. With regard to the two accounts at First Jersey National Bank, petitioner testified that one of the accounts was a "regular account" and the other was a "special account" specifically for reporting Treasury bill interest income. In 1981, interest of $ 3,095.04 accrued on the regular account, and interest of $ 4,985.59 accrued on the special account. Petitioner's testimony at trial suggested that the interest on the special account had been included in the amount reported on his joint return as interest from "U.S. Gov Treasury Bills". However, on brief, petitioners state that they did not receive a Form 1099 from First Jersey National Bank with respect to $ 8,081 and their failure to report this amount was an "oversight". Based on that concession, we *397 sustain respondent's determination that petitioners' income for 1981 should be increased by $ 8,271. 3. Section 6621(c) -- Increased Interest
Respondent determined that the entire underpayment for 1983 and a part of the underpayments for 1981 and 1982 are "substantial underpayments attributable to tax-motivated transactions" within the meaning of that phrase as used in section 6621(c), formerly section 6621(d). Accordingly, respondent determined that petitioners are liable for increased interest under section 6621(c) for each of the years at issue. Petitioners bear the burden of proving that respondent's determination is incorrect. Rule 142(a). Section 6621(c)(1) provides that in the case of a substantial underpayment attributable to a tax-motivated transaction the annual rate of interest shall be 120 percent of the normal rate of interest applicable to an underpayment. For this purpose, a substantial underpayment attributable to a tax-motivated transaction is defined to mean an underpayment which is attributable to one or more tax-motivated transactions if the amount of the underpayment for the year exceeds $ 1,000. The definition of "tax-motivated transactions" *398 includes "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v); see also Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gromberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Sheldon v. Commissioner, 94 T.C. 738, 770 (1990). Petitioners take the position that there is no "tax-motivated transaction" because the transactions at issue were not shams or fraudulent, petitioner was "at risk" with respect to the transactions, and he had a profit motive. To the contrary, as discussed above, petitioners failed to meet their burden of disproving respondent's determination that the subject transactions were shams. Accordingly, we sustain respondent's determination that the transactions were shams, and we also sustain respondent's determination that the transactions are tax-motivated transactions for purposes of section 6621(c). Thus, petitioners are liable *399 for the increased rate of interest pursuant to 6621(c) for each of the years at issue. 4. Section 6653(a) -- Negligence Addition
Respondent determined that the underpayments for 1981 and 1983 were due in part to negligence or intentional disregard of rules and regulations. Accordingly, respondent further determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2) for 1981 and 1983. Petitioners bear the burden of proving that respondent's determination is wrong. Rule 142(a). Section 6653(a)(1) provides for an addition to tax of 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an addition of 50 percent of the interest due on any part of the underpayment which is attributable to negligence or intentional disregard of rules and regulations. Negligence is defined as the "'lack of due care or failure to do what a reasonable and ordinary prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). *400 In petitioners' opening brief, they take the position that there is no underpayment of tax with respect to the 1981 and 1983 tax years, but even if there is an underpayment, "there is no evidence that it is due to Petitioner's negligence or intentional disregard of rules and regulations." Thus, it appears that petitioners fail to perceive that they bear the burden of disproving respondent's determination of negligence. Rule 142(a). In petitioners' answering brief, they advance the proposition, without further elaboration: "Inasmuch as Petitioners properly filed his tax returns reporting the leasing transactions in this case, there is no basis for additions under Section 6653." We disagree and hereby sustain respondent's determination. 5. Other Matters
At the end of the trial of this case, the Court raised the issue whether petitioner and Mr. Amdur had violated Rule 145 by consulting about the case after Mr. Amdur had testified as a witness or whether certain other aspects of their conduct were improper. Upon consideration of our opinion deciding the other issues in the case, we do not believe it is necessary to address this issue. Furthermore, we overrule the evidentiary *401 objections raised in respondent's post-trial brief. Based upon the foregoing and concessions of the parties, Decision will be entered under Rule 155.